Criminal Complaint      AUSAs Patrick Otlewski (312) 469-6045 and Steven Grimes (312) 469-6049

**FILED**
APR 8 2013
4-8-13
MAGISTRATE JUDGE
JEFFREY T. GILBERT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

GREGORY CHESTER,
   also known as "Bowlegs"

MAGISTRATE JUDGE GILBERT

**CRIMINAL COMPLAINT**

CASE NUMBER: 13 CR 0289

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

On or about September 1, 2011, at Chicago, in the Northern District of Illinois, Eastern Division, GREGORY CHESTER, also known as "Bowlegs," defendant herein, knowingly and intentionally distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

APR 0 8 2013

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Signature of Complainant
Bryant Hill
Special Agent, Federal Bureau of Investigation

JUDGE'S COPY

Sworn to before me and subscribed in my presence,

April 8, 2013
Date

Jeffrey T. Gilbert, U.S. Magistrate Judge
Name & Title of Judicial Officer

at Chicago, Illinois
City and State

Signature of Judicial Officer

UNITED STATES DISTRICT COURT  )
                                                             ) ss
NORTHERN DISTRICT OF ILLINOIS  )

## AFFIDAVIT

### I. Introduction

I, BRYANT HILL, being duly sworn, state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice. I have been so employed for approximately seven years, and I have participated in drug trafficking investigations throughout my career with the FBI. In connection with my official duties, I investigate criminal violations of the federal narcotics laws, including but not limited to 21 U.S.C. §§ 841(a)(1) and 846. I have also been involved in various types of electronic surveillance and in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking. I have received specialized training in the enforcement of laws concerning the activities of narcotics traffickers.

2. The following information is based upon my personal observations, and knowledge and information I received from other federal law enforcement officers and Chicago Police Department Officers.

3. My understanding and interpretation of conversations set forth in this affidavit are based on my knowledge of the investigation to date, the context of the conversations, consensual audio and video recordings made in this

investigation, my training and experience, and conversations I have had with other agents and officers experienced in narcotics and gang investigations.

4. This affidavit is submitted in support of a criminal complaint alleging that on or about September 1, 2011, GREGORY CHESTER, also known as "Bowlegs," knowingly and intentionally distributed a controlled substance, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging CHESTER, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

## II. Factual Basis Supporting Probable Cause

5. In approximately May 2011, a cooperating source ("CS") was arrested by the Chicago Police Department ("CPD"). CS provided information to CPD and ultimately was not charged with a crime. CS is now assisting the FBI and the CPD in ongoing criminal investigations in exchange for monetary compensation by the FBI.[1]

---

[1] To date, CS has been paid approximately $28,000 (including expenses) for CS's cooperation in this, and numerous other, investigations. CS was also given money for expenses and relocation. CS's cooperation has proven reliable in numerous cases, including

A. Controlled Purchase of Heroin on June 1, 2011

6. According to CS, on approximately May 18, 2011, CS spoke with GREGORY CHESTER near 58th Street and Wolcott, in Chicago, in an unrecorded conversation. According to CS, CHESTER stated that he would sell CS 50 grams of heroin for approximately $70 per gram.

7. On June 1, 2011, at approximately 12:05 p.m., agents observed CS dial telephone number (773) 663-3798 (hereafter, "Chester Phone 1"). CS then spoke to CHESTER in a consensually monitored and recorded conversation,[2] during which CHESTER stated, "Cuz, be cool, I'm trying to call him now [meaning, CHESTER was attempting to contact an individual to obtain heroin for CS]." Over the next several hours, CS attempted to telephone CHESTER, but each call went to voicemail.[3]

8. According to phone records, on June 1, 2011, between 2:09 p.m., and 2:18 p.m., there were three contacts between Chester Phone 1 and

---

investigations related to narcotics, firearms, and murder. According to a law enforcement database, CS has been arrested approximately 16 times for assault, battery and drug offenses, but has not been convicted of any felony offenses.

[2] The identification of CHESTER and CHESTER's voice is based upon the following: First, CS stated that s/he recognized CHESTER's voice during the recorded conversations based on his/her prior interactions with CHESTER. Second, law enforcement agents have spoken, at length during a voluntary interview, with CHESTER, and recognize CHESTER's voice on the recordings. Third, during the time period discussed in this affidavit, toll records for Chester Phone 1 show that it was in contact with telephone numbers used by two different women, including Individual B and Female A, who are known by law enforcement officers to have relationships with CHESTER.

[3] Unless otherwise indicated in this Affidavit, toll records confirm the calls on the dates discussed in this Affidavit.

telephone number (773) 749-1518 ("Individual A Phone 1"), which as described below is known to be used by Individual A.

9. At approximately 3:50 p.m., CS received a telephone call. This call was not recorded. According to CS, CS recognized the speaker as CHESTER's close associate, Individual A. According to CS, Individual A instructed CS to meet Individual A at the Goal Post Lounge, located near 71st Street and Eberhart, in Chicago, Illinois.

10. At approximately 4:00 p.m., agents searched CS and CS's vehicle for contraband and large sums of money, with negative results. Agents equipped CS with an audio-recording device, and provided CS with $3,500. Agents maintained surveillance on CS as CS traveled to the Goal Post Lounge.

11. According to CS, when CS entered the lounge, CHESTER was standing near the front of the bar. According to CS, CHESTER approached CS and whispered in CS's ear that he would "take care of" CS [meaning provide heroin to CS], and that CS should sit at the bar. According to CS, CS observed CHESTER sit down at a table with Individual C and Individual D. CS then observed CHESTER hand one small package wrapped in a white paper napkin to Individual D, and hand another similar package to Individual C. CS observed Individual C and CHESTER then walk towards the rear of the lounge, and Individual D approached CS. According to CS, CS then handed $3,500 to

Individual D, and Individual D handed a white paper napkin containing suspect heroin to CS.

12. At approximately 4:35 p.m., agents observed CS leave the Goal Post Lounge and enter CS's vehicle. Agents maintained surveillance of CS as CS drove to a prearranged meeting location. At the meeting location, CS gave agents a white paper napkin wrapped around a clear plastic baggy, which contained a brown rock-like substance, believed by agents to be heroin. Agents then searched CS and CS's vehicle for contraband and large sums of money, with negative results, and retrieved the audio-recording device from CS.

13. Agents field-tested the substance provided by CS for the presence of heroin, with positive results. A DEA laboratory analysis of the substance that CS provided to agents revealed that the substance was heroin, with a net weight of 49.1 grams.

**B.  Controlled Purchase of Heroin on June 9, 2011**

14. On June 7, 2011, Individual B, an individual who has a personal relationship with CHESTER, informed the Chicago Police Department that CHESTER used Chester Phone 1.

15. On June 8, 2011, at approximately 6:37 p.m., CS spoke with CHESTER in a consensually recorded conversation on Chester Phone 1. During the conversation, CS asked, "You know for sure … or do you think so [inquiring about CHESTER's ability to supply narcotics today]?" CHESTER stated, "Cuz,

just chill man, give me 24 hours ... relax for 24 hours ... I promise you, I'm gonna come over there and grab you [meaning that CHESTER would obtain heroin for CS within the next 24 hours]."

16. On June 9, 2011, at approximately 1:26 p.m., CS received a consensually monitored and recorded call from CHESTER on Chester Phone 1. During the conversation CS stated, "the light-skinned dude call me earlier." According to CS, CS was pretending to be brokering a narcotics transaction between CHESTER and a light-skinned man. CHESTER stated, "I'm going to get up [meet up] with you today, for sure." CS stated, "Alright ... make sure you hit my phone [call CS back on CS's phone]."

17. According to CS, CS attempted to contact CHESTER numerous times between approximately 4:52 and 4:56 p.m., but those calls were not answered. However, according to phone records, at approximately 4:52 p.m., Chester Phone 1 twice called (773) 559-8508 ("Individual A Phone 2").

18. At approximately 5:30 p.m., CS received an incoming call from Individual A Phone 1. This conversation was not recorded and did not occur in the presence of law enforcement. According to CS, the caller was Individual A, and Individual A instructed CS to meet Individual A at a garage near 58th Street, between Prairie and Calumet Avenues in Chicago, Illinois.

19. At approximately 5:48 p.m., agents equipped CS with an audio/video recording device. Agents also searched CS and CS's vehicle for

narcotics, contraband, and large sums of money, with negative results. Agents maintained surveillance of CS as CS drove to the area of 58th Street and Prairie Avenue, in Chicago.

20. According to CS, at approximately 5:59 p.m., CS exited his/her vehicle and met with Individual A. According to the audio/video-recording device, CS stated, "I'm trying to grab a hundred grams ... that's why I've been trying to get a hold of ..., I can't tell him like I want to tell him." According to the audio/video-recording device, Individual A stated, "Give me like 15 minutes ... Let's see what's up with little Cuz and them. If they do [have 100 grams of heroin], I'm gonna call you and be like, 'man slide by right here' [Individual A will call CS and tell CS to meet him at the same location]. But if I don't call you that means ... you know what I'm saying ... that way we ain't gotta be hotting up with them lines [talking about drugs on the telephone]." According to CS, although not reflected in the recording, Individual A softly spoke words to the effect of "Goof ball is going to get it [meaning retrieve the heroin]."

21. At approximately 6:12 p.m., CS met with agents at a pre-arranged meeting location and agents deactivated the recording device.

22. At approximately 6:25 p.m., while in the presence of agents, CS received a call from a telephone number that CS did not recognize –

Individual A Phone 2.[4] CS did not record the conversation, but CS turned on the speaker phone option of CS's cellular phone, so that agents could also hear the conversation. Individual A was the caller,[5] and Individual A instructed CS to meet Individual A at a gas station near 75th Street and Cottage Grove Avenue, in Chicago, Illinois.

23. At approximately 6:30 p.m., agents reactivated the recording device, searched CS for narcotics, contraband, and large sums of money, with negative results, and provided CS with $8,000 in FBI funds.

24. At approximately 6:33 p.m., agents maintained surveillance as CS left the meeting area and drove to the intersection of 76th Street and Cottage Grove.

25. According to the audio/video recording, at approximately 6:50 p.m., CS spoke with Individual A on the telephone and stated, "Where you

---

[4] According to toll records, there were a number of contacts between Individual A Phone 2 and Chester Phone 1, including a number of contacts on June 9, 2011.

[5] The identification of Individual A and Individual A's voice is based upon the following. First, CS identified Individual A's voice. Second, as described below, CS recorded Individual A speaking while CS was with Individual A inside a rental minivan. Agents contemporaneously observed the rental minivan, and confirmed that the individual who rented the minivan had previously listed Individual A as an additional driver of the rental car. Third, CS has video-recorded Individual A, and although Individual A's face is not shown on the video recordings, Individual A's body type and shape is consistent with information stored in law enforcement databases concerning Individual A's physical appearance. Fourth, agents have listened to numerous recordings of the individual CS stated is Individual A, and determined that all of the recordings are of the same person. Fifth, during a three-week period, Individual A Phone 1 had over 160 contacts with a phone registered to a female known by law enforcement officers to be Individual A's girlfriend.

at ... I'm pulling in." At approximately 6:51 p.m., agents observed CS arrive at the Citgo gas station, near 76th and Cottage Grove. Agents observed CS approach a black male who was in the driver's seat of a tan Chevrolet Blazer. Agents observed CS enter the tan Chevrolet Blazer and engage in a transaction with the driver.

26. According to CS, Individual A was driving the tan Chevrolet Blazer. According to the audio/video recording, at approximately 6:52 p.m., CS approached Individual A's vehicle and entered the front passenger seat. According to CS, a bag of what appeared to be heroin was located in the center console of the vehicle. According to CS, CS handed the $8,000 in FBI funds to Individual A and Individual A handed the suspect heroin to CS. CS then exited the vehicle. According to the audio recording, as CS was entering CS's vehicle, Individual A yelled, "Put your seat belt on, man [which CS understood to be a precaution to avoid being stopped by law enforcement]."

27. Agents maintained surveillance of CS as CS left the gas station and returned to the meeting location. At the meeting location, CS provided agents with what appeared to be heroin. Agents then searched CS and CS's vehicle for additional narcotics, contraband, and large sums of money, with negative results, and retrieved the audio/video-recording device.

28. Agents field-tested the substance provided by CS for the presence of heroin, with positive results. A DEA laboratory analysis of the

suspect heroin revealed that the substance was heroin, with a net weight of 100.2 grams.

### C. Attempted Purchase of Heroin on August 18, 2011

29. Prior to August 3, 2011, CS gave consent to law enforcement officers to record conversations over a telephone used by CS ("CS's Phone"). On August 3, 2011, Chief Judge Holderman authorized law enforcement officers to monitor and record conversations over CS's phone for a period of 30 days.

30. On August 18, 2011, at approximately 2:06 p.m. (Call #76), CS, using CS's Phone, had a conversation with CHESTER, using telephone number (312) 285-9315 ("Chester Phone 2"). CS stated, "I need to holler at you right now. It's important like a mother fucker, it can't even wait." CHESTER stated, "Oh, about what you told me?" According to CS, CS and CHESTER had previously discussed, several days earlier, in an unrecorded conversation, that CHESTER was looking to buy several guns.

31. Approximately twenty-four minutes later, at approximately 2:30 p.m. (Call #77), CS, using CS's Phone, had a conversation with CHESTER, using Chester Phone 2. CHESTER stated, "I'm fitting to have homey hit you up. [CHESTER is having Individual A call CS]." According to toll records, at approximately 2:34 p.m., Chester Phone 2 was in contact with telephone number (773) 540-5454 ("Individual A Phone 3"). At approximately 2:36 p.m. (Call #78), Individual A, using Individual A Phone 3, called CS, using CS's Phone, and

Individual A identified himself as "Double." Individual A stated, "Homey [CHESTER] just told me to hit you [CHESTER told Individual A to call CS]." Individual A asked, "What's the deal?," and "where you want me to meet ya?" CS stated, "I'm right here by the crib." Individual A asked, "Where I came the other day [on June 1, 2011, to deliver heroin]?" CS stated, "No." CS then discussed that CS needed to talk to "homey [CHESTER]."

32. At approximately 2:58 p.m. (Call #79), CS, using CS's Phone, had a conversation with Individual A, using Individual A Phone 3. CS asked, "How long it take you to get on 51st and Calumet?" Individual A stated, "I'll be down there in about 5 minutes." At approximately 3:13 p.m. (Call 81), Individual A, using Individual A Phone 3, called CS, using CS's Phone, and asked, "Where you at?" CS stated, "Standing right here on the corner of 51st and Calumet."

33. At approximately 3:10 p.m., agents equipped CS with an audio/video recording device. Agents also searched CS and CS's vehicle for narcotics, contraband, and large sums of money, with negative results.

34. According to the audio/video recording, at approximately 3:18 p.m., CS met with Individual A. According to CS, CS entered the passenger side of a vehicle driven by Individual A, and then Individual A proceeded to drive. While driving, CS stated, "I was trying to see shit, I was hollering at him, telling him [CHESTER] ... Dude [CS's fictional buyer] want a 100 [grams of

heroin] …Get 10 [grams] right now and see what his ass [CHESTER] going to charge for 100 [CS was stating that CS's fictional buyer wanted 100 grams of heroin, but would take 10 grams now and see how much CHESTER would charge for 100 grams]." Individual A asked, "Where do you want me to meet you at, you want me to come back right here [51st and Calumet]?" CS asked, "You finnin to take three hours man?" Individual A stated, "Give me like 10 minutes, 15 minutes at the most. I'm just goin to pull up, I ain't going to call your phone."

    35. According to the audio/video recording device, at approximately 3:57 p.m., Individual A returned to the area of 51st and Calumet in Chicago to meet with CS. According to CS, CS entered the vehicle being driven by Individual A. According to the audio/vide recording device, Individual A stated that he had to "go grab her real quick and bring her back to the crib. But look, look, look. I'm finnin to grab her and bring her back right here and then you can just come to the um field house." According to the audio/vide recording device, Individual A continued, "I got to grab her, I can't get in. That's 10-20 minutes." According to the audio/vide recording device, Individual A stated, "Man, I'm trying to get in the door. Look, you got a ride to the field house [which, as described below during the transaction on September 1, 2011, was located in the area of 55th Street and Martin Luther King]?" According to CS, CS then began to exit Individual A's vehicle. According to CS, CS understood that

Individual A was unable to deliver the requested narcotics, and CS ended the meeting and exited Individual A's vehicle.

36. Continuing on August 18, 2011, at approximately 9:08 p.m. (Call #120), CS, using CS's Phone, spoke with CHESTER, using Chester Phone 2. CHESTER asked, "Why you stop answering your phone?" CS stated, "My shit went dead." CS further stated, "That n----- [Individual A] was fucking around [by not delivering the heroin]."

### D. Controlled Purchase of Heroin on September 1, 2011

37. On September 1, 2011, at approximately 1:09 p.m. (Call #170), CS, using CS's Phone, spoke with CHESTER, using Chester Phone 2. CS stated, "I need to get on the side of you [meet up], right now." CHESTER stated, "Alright man, I'm ... fitting to come that way [meet up]."

38. At approximately 1:15 p.m., agents searched CS and CS's vehicle for contraband and large sums of money, with negative results. Agents equipped CS with an audio-recording device, and provided CS with $8,000 in FBI funds.

39. At approximately 1:26 p.m. (Call #172), CS, using CS's Phone, had a conversation with CHESTER, using Chester Phone 2. CHESTER stated, "I'm coming around. Where you at right now?" CS stated, "I'm walking down ... Calumet." CHESTER stated, "I should be there in 10 to 12 minutes."

40. At approximately 1:50 p.m., agents observed CS standing in the area of 51st Street and Calumet Avenue in Chicago. Agents observed a dark minivan, bearing Illinois license plate L64362, which according to law enforcement databases was registered to a rental car company (the "Rental Minivan"),[8] approach CS. Agents observed CS enter the minivan.

41. According to the audio/video recording, CS entered a dark blue or black minivan at approximately 1:52 p.m. Also according to the audio/video recording, while inside the minivan, CHESTER stated, "What up with it ... they got the money right here?" According to the audio/video recording, CS stated, "Got the money right here." According to the audio/video recording, CHESTER asked, "How much is there?" CS stated, "8 ..." According to the audio/video recording, CHESTER stated, "Alright. ... Come on, you might as well stay with us [to go get the heroin]." According to the audio/video recording, CS stated, "They gonna be crying if I pull out with their bread [CS's fictional buyer would be upset if CS left with their money]." According to the audio/video recording, CHESTER asked, "Where they at [where are CS's fictional buyers]?" According to the audio/video recording, CS stated, "They up in the building." According to the audio/video recording, CHESTER stated, "Man, fuck them, this

---

[8] A law enforcement database revealed that the minivan is a rental vehicle leased by Dollar/Thrifty Rental. According to Dollar/Thrifty Rental records, the minivan was rented by Individual A on August 27, 2011. According to the rental records, Female B rented a vehicle on February 5, 2011, and listed Individual A as an "additional driver" for the rental vehicle.

ain't gonna take about 20 minutes, what they think, you gonna run out." According to the audio/video recording, CS stated, "I can give you the bread, and you take care of ..." According to the audio/video recording, CHESTER asked, "This ain't the police ...?" According to the audio/video recording, CS stated, "Hell no." According to the audio/video recording, CHESTER stated, "Alright. Tell them [CS's fictional buyer] 10 minutes, but I'm gonna be 20." According to the audio/video recording, CS can be seen holding a wad of money, and then CS's arm can be seen reaching into the backseat, appearing to give the money to the backseat passenger. According to the audio/video recording, Individual A's voice can be heard inside the vehicle.[9] Agents observed CS exit the minivan within several minutes of entering it.

42. At approximately 1:57 p.m., CS sent agents a text message stating, "that was just him [CHESTER] [i]n that black van that just rode pass u[,] i gave him the money[.] he said he ... be back [i]n 20 minute[.] its him [CHESTER] and double [Individual A] was [the] drive[r]... i [handed CHESTER] the money [i]n the b[a]ck." According to CS, Individual A was driving the minivan and CHESTER was in the backseat. According to CS, CS gave the $8,000 to CHESTER in the backseat.

---

[9] From the context of the conversation, it appears that Individual A was talking on a cell phone to another individual.

43. At approximately 2:16 p.m., 2:26 p.m., and 3:09 p.m. (Calls #173, #175, and #179), CS, using CS's Phone, spoke with CHESTER, using Chester Phone 2. During each conversation, CHESTER updated CS on CHESTER's location or how long it would be until CHESTER met with CS. At 3:09 p.m., CHESTER stated, "Three minutes."

44. At approximately 3:15 p.m., agents observed CS speaking with the driver of a green four-door sedan near 51st and Calumet. According to the audio/video recording of the meeting, at approximately 3:18 p.m., CS approached and entered a green colored vehicle in a parking lot. According to CS, CHESTER was the driver of the green four-door sedan. According to CS, while CS was inside the vehicle, CHESTER stated that there were too many of "them people [police officers]" around, so CHESTER instructed CS to meet Individual A at the Field House basketball gym, which CS knew was located at 55th Street and Martin Luther King Drive. According to the audio/video recording, a radio was playing loudly inside the vehicle, but agents have listened to the recording and identified CHESTER's voice.

45. According to the audio/video recording, CS exited the green vehicle, and then walked to the area of 55th Street and Martin Luther King Drive. At approximately 3:29, CS entered the Field House. According to the audio/video recording, at approximately 3:30 p.m., CS met Individual A, and Individual A stated, "Whatever door side open, look in the cup holder on the door." Individual A further stated, "Man, stay out of trouble."

46. Agents observed and the audio/video recording depicted CS leave the Field House, approach the Rental Minivan in a nearby parking lot, open the rear passenger door to the vehicle, and briefly enter the Rental Minivan, which was parked near 55th Street and Martin Luther King Drive. According to CS, CS retrieved a quantity of heroin from the cupholder inside the Rental Minivan.

47. Approximately six minutes later, CS met with agents. CS gave agents a small clear plastic baggy, which contained a brown rock-like substance, believed by agents to be heroin. At approximately 3:40 p.m., agents searched CS for contraband and large sums of money, with negative results, and agents retrieved the audio/video-recording device.

48. A DEA agent conducted a field test of the suspect heroin, which testified positive for the presence of heroin. A DEA laboratory analysis of the suspect heroin revealed that the substance was heroin, with a net weight of 98.7 grams.

### III. Conclusion

49. Based on the foregoing, I respectfully submit that beginning on or about September 1, 2011, GREGORY CHESTER, also known as "Bowlegs," violated Title 21, United States Code, Section 841(a)(1), and Title 18 United States Code, Section 2, in that he distributed a controlled substance, namely, mixtures containing heroin, a Schedule II Narcotic Drug Controlled Substance.

FURTHER AFFIANT SAYETH NOT.

BRYANT HILL
Special Agent, Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on April 8, 2013.

Jeffrey T. Gilbert
United States Magistrate Judge